# Exhibit A

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA

JUST PLAY, LLC,

    Plaintiff,

CASE NO.: _____

v.

FITZMARK, INC.,

    Defendant.

_____/

## COMPLAINT

Plaintiff, Just Play, LLC ("**Just Play**"), by and through undersigned counsel, files this complaint against Defendant, FitzMark, Inc. ("**FitzMark**") and alleges:

### PARTIES, JURISDICTION AND VENUE

1. This is an action for damages in excess of $30,000.

2. Just Play is a Delaware Limited Liability Corporation with a principal place of business in Boca Raton, Florida.

3. FitzMark is an Indiana corporation with its principal place of business in Indianapolis, Indiana.

4. This Court has subject matter jurisdiction over this action because the amount in controversy exceeds $15,000.00, exclusive of interest, costs and attorneys' fees, pursuant to Florida Statute § 26.012.

5. This Court has personal jurisdiction over FitzMark pursuant to Florida Statute § 48.193 because, among other reasons, FitzMark engages in business within the state and caused injury to Just Play in Florida while FitzMark was engaged in solicitation or service activities within Florida.

6. Venue is proper pursuant to Florida Statute Section § 47.011 because one or more causes of action alleged in this Complaint accrued in West Palm Beach County, Florida.

7. All conditions precedent to the filing of this action occurred, or have been performed, excused or waived.

## FACTUAL ALLEGATIONS

### Summary

8. Just Play is a leading manufacturer of popular children's toys. FitzMark provides warehousing services – in short, FitzMark warehouses and manages products for customers. Just Play hired FitzMark to provide warehousing services for its products, but FitzMark failed to perform pursuant to the parties' agreement. FitzMark's failures caused Just Play significant damages.

### Just Play's Business Operations

9. Just Play is a leading manufacturer of popular children's toys. Just Play works with the world's leading children's entertainment brands, including Disney Consumer Products, Twentieth Century Fox, and Nickelodeon. Just Play manufactures and distributes these products to every major mass retailer throughout North America and around the world, including WalMart, Target, Amazon, and many more.

10. Just Play manufactures most of its products in Asia. Many of Just Play's customers take receipt of product directly from these Asian factories and subsequently ship products directly to their retail stores or distribution centers in the United States.

11. Just Play's customers also require that Just Play maintain inventory in California for rapid replenishment. This portion of Just Play's business is referred to as Domestic Shipment, and the products shipped pursuant to this process are referred to as "Domestic Shipment Products".

2

12. For Domestic Shipment Products, the process begins when goods are shipped by Just Play from China to the United States, via ocean freight carriers.

13. Just Play oversees and manages this process via its Daily Shipment Report ("DSR"). As the name implies, the DSR is updated daily and has complete details of all of the Domestic Shipment Products in every container carried on every ship.

14. Once Domestic Shipment Products arrive from Asia, but before customer orders are placed, Just Play must transport the Domestic Shipment Products to a warehouse, unload the Domestic Shipment Products from the shipping containers, and store its Domestic Shipment Products in inventory for eventual shipment to its retail customers.

15. Just Play stores its Domestic Shipment Products at warehouses in California owned by third parties.

16. When the Domestic Shipment Products arrive in the California port, trucks bring the containers to Just Play's third-party warehouse provider. The warehouse then unloads the containers, logs what products were received, moves those products to identified locations in the warehouse, and informs Just Play that the product has been received.

### Just Play Provides its Warehouse Requirements to FitzMark

17. In 2018, Just Play explored retaining a new warehouse service provider in Southern California with the capability and space needed to accommodate Just Play's rapid growth.

18. In January 2018, Just Play met with FitzMark's employee Tony Gurrola at FitzMark's facility in Carson, California. Just Play explained its Domestic Shipment Products process and the services it required from a warehouse service provider.

19. Just Play explained to FitzMark that to qualify as a Just Play warehouse provider, it must (i) have Electronic Data Interchange ("EDI") file exchange capabilities; (ii) provide

3

UCC-128 carton labels; (iii) generate packing lists and bills of lading; (iv) provide order management services, including online portal visibility to inventory and order tracking, end-of-day on hand inventory reports, and EDI Advance Ship Notices ("ASNs") to be sent at the time of shipping to Just Play's customers; and (v) maintain Just Play's goods directly on the warehouse floor for quick shipment to customers, and not in overhead racks that require significantly more retrieval time. (collectively, the "Services")

20. All warehouse providers have internal systems for tracking products. Some warehouse providers apply barcodes to each pallet brought into the warehouse, while other warehouse providers post barcodes on the racks or floor locations that are scanned each time products are moved to that location. Particularly in a large warehouse with hundreds of items spread over hundreds of thousands of square feet, it is essential that the warehouse provider be able to quickly locate all items at all times.

21. FitzMark represented to Just Play that it had extensive experience performing the Services, and that FitzMark would provide the Services to Just Play. FitzMark also represented that it could provide Just Play with sufficient floor space to accommodate all of its products.

22. FitzMark also assured Just Play that it had extensive experience delivering products to retail customers like WalMart, Target, and Amazon. Indeed, FitzMark claimed that it had current customers that shipped to these same retailers and thus, FitzMark was familiar with their specific requirements for receiving shipments.

23. So that FitzMark would have an accurate projection of Just Play's future shipments, Just Play provided FitzMark with a PowerPoint presentation containing the inbound shipment statistics of its product inventory from 2017. Just Play explained that it expected an even higher volume of activity in the future.

24. FitzMark once again confirmed that it was capable of handling any volume of products that Just Play could ship to them.

25. Just Play's retail customers use electronic systems to send their purchase orders to Just Play. This process allows the retailers to match (1) the products they receive to (2) the orders they placed and (3) the invoices that Just Play later sends for payment. This matching is essential in allowing the retailers to track the huge volume of product received each day and accurately pay the invoices received from vendors like Just Play.

26. Just Play receives electronic purchase orders from its retail customers every day. When an order is received, Just Play confirms the details (e.g., price, quantity, item numbers) and then forwards the order to its warehouse provider by electronically sending an EDI transmission known as a "warehouse shipping order" or a "940".

27. The 940 contains all the order details including the items and quantities to be shipped, the shipping dates, and the addresses. The 940 is also used to generate the UCC-128 labels that are applied by the warehouse to each outbound carton. Each batch of UCC-128 labels corresponds to a specific product shipment. Some shipments may make up just a portion of a full truck, while others may be several trucks.

28. Again, FitzMark represented to Just Play that it had extensive experience dealing with 940s and UCC-128 labels, and that it could perform the Services.

29. Specifically, FitzMark also represented to Just Play that it was able to timely process its own UCC-128 labels directly from the 940s that Just Play forwarded. This service was critical because it would obviate the need for Just Play to create the UCC-128 labels and send them to FitzMark to print out and attach to the Domestic Shipment Products in the warehouse.

30. Indeed, on a typical day, Just Play requires its warehouse provider to label and ship 15,000-25,000 master cartons of product. FitzMark's ability to handle the UCC-128 labeling process was one of the reasons that Just Play agreed to retain FitzMark as its warehouse provider.

31. Once UCC-128 labels are printed, warehouse workers must pull the products required from the warehouse floor. An assembly line is then set up whereby the cartons are labeled and staged for pickup by outbound truckers.

32. Once trucks are loaded and the product is shipped, Just Play is required to send Advance Shipping Notices ("ASNs") to its customers. ASNs are electronic documents that contain the bar code detail for every carton in the order, the total numbers of cartons in the order, and the truck that is carrying the order. Just Play's customers require that the ASNs be sent to them before the products reach their distribution centers.

33. FitzMark represented to Just Play that it had a computer system that would allow FitzMark to send ASNs to customers immediately after shipment. In fact, this was another reason that Just Play agreed to retain FitzMark as its warehouse provider.

34. FitzMark also represented to Just Play that it employed warehouse workers who were qualified to pull the products and stage them for pickup.

**The Trial Period and FitzMark's Request for More Business**

35. In June 2018, based on FitzMark's representations that it was capable of providing the Services and necessary floor space, Just Play agreed to ship a limited number of products for a limited number of customers through FitzMark on a trial basis (the "Trial Period").

36. The trial products were scheduled to arrive at FitzMark's California warehouse by October 2018. The trial basis was designed to allow FitzMark to become familiar with Just

Play's processes, and to work through any issues encountered related to EDI setup and testing, item set-up, process review, and related start-up issues. Just Play invested significant time to set up a "data bridge" between Just Play's and FitzMark's EDI systems. This included running test orders so that Just Play could ensure the data was properly exchanged.

37. The Trial Period was successful. Just Play worked with FitzMark to manage the inbound orders and FitzMark shipped them out to Just Play's customers on schedule. FitzMark did not report any material issues between its systems and Just Play's systems.

38. In January 2019, following the successful conclusion of the Trial Period, FitzMark told Just Play that it was ready and able to manage more of Just Play's products for more of Just Play's customers. Just Play informed FitzMark that the order load could and would become substantial. Nonetheless, FitzMark stated that it was ready to handle the additional products.

39. In fact, FitzMark represented to Just Play that because Sony, the owner of the building that FitzMark used for its warehouse, and Simple Human, one of FitzMark's other customers, were moving out of portions of the warehouse building, FitzMark would use the additional storage space for Just Play's products.

40. In or about February and March of 2019, Just Play sent FitzMark a list of potential items to be sent to FitzMark. FitzMark confirmed that it could handle the volume described.

41. As the products began to ship from Asia, Just Play sent FitzMark regular reminders of its updated plans, including the DSR which gave FitzMark exact detail of all product three weeks prior to arrival in the United States.

42. Just Play also invited FitzMark to attend a June 6, 2019 "Amazon Supply Chain Workshop Prepared for Toy Suppliers" put on by Amazon, one of Just Play's largest customers.

7

At this seminar, Amazon explained exactly what it required of its vendors from a supply chain management perspective. Amazon also provided a 107-page presentation, which included explanations of when Amazon issues chargebacks to suppliers for unfulfilled requirements.

43. Just Play also provided FitzMark with its customers' routing guides. These routing guides set forth the specific requirements for shipment, including WalMart, Target, and Amazon.

44. FitzMark again represented that it had the ability to meet the customers' requirements.

45. FitzMark was also aware that its failure to timely ship Just Play products to other of Just Play's customers – including, but not limited to, major accounts like WalMart, Kohl's, and Target – would result in Just Play incurring chargebacks for delayed or canceled shipment.

**FitzMark Fails to Perform the Services Required By the Parties' Agreement**

46. Relying on FitzMark's representations that it could perform the Services for an increased volume, in 2019 Just Play agreed to increase the number of products that it shipped to FitzMark. In early 2019, FitzMark and Just Play also agreed to the rates Just Play would pay FitzMark for the Services going forward. Just Play agreed to pay lower rates to FitzMark than it had paid during the Trial Period.

47. Just Play set up weekly conference calls between its operations team and FitzMark's team to manage the product increase.

48. In June 2019, Just Play began preparing FitzMark for the arrival of its Domestic Shipment Products to FitzMark's warehouse, including sending an employee to FitzMark's warehouse in advance of the arrival of the first shipment.

49. When the Just Play employee arrived at the FitzMark warehouse, he learned that FitzMark was not abiding by the Parties' agreement. He saw that contrary to FitzMark's

8

representation, a substantial portion of the warehouse was still filled with Simple Human products, and that Sony had not yet vacated the designated space. When the Just Play employee raised concerns with the lack of available space (and specifically the floor space agreed to by the parties), a FitzMark employee represented that Sony and Simple Human would be moving out of the space imminently, and that all of the rack space would be removed in a matter of days in order to open up floor space needed for Just Play's incoming products.

50. In the early summer of 2019, Just Play's products began to arrive at the FitzMark warehouse. Almost immediately, FitzMark failed to provide the Services. FitzMark sent required information and reports late, or sometimes not at all. When Just Play requested the reports, FitzMark admitted that they were "behind," but promised to catch up quickly.

51. FitzMark also failed to send outbound ASN's, neglected to update the system portal, and intentionally kept Just Play uninformed of a multitude of inbound and outbound processing issues and problems storing and locating products.

52. In late June 2019, Just Play demanded that FitzMark explain these deficiencies.

53. FitzMark told Just Play that it had hired a new receiving manager from a well-known logistics company to address the mismanagement of Just Play's products. FitzMark also promised to add additional staff to its existing roster to properly manage Just Play's products.

54. This representation was again false. In fact, at the time Just Play raised its concerns, FitzMark had fired its entire inbound crew, including its manager, and was starting completely anew with an untrained and inexperienced team that was tasked with handling Just Play's products.

55. On or about the same time as Just Play's visit, and unbeknownst to Just Play, FitzMark was failing to timely and properly receive products, store products, and ship out Just Play orders.

9

56. To hide FitzMark's delay from Just Play, FitzMark employees began paying demurrage fees assessed by the freight companies on FitzMark employee's personal credit cards.

57. While FitzMark was attempting to keep Just Play in the dark, Just Play received complaints from its customers that orders were not being fulfilled. In mid-July, after receiving these complaints, Just Play immediately questioned FitzMark about these unfulfilled orders. FitzMark again admitted that it was "behind" on the inbound order services.

58. This time, however, FitzMark did not promise to rectify the situation. Instead, all FitzMark could offer was to reschedule already delayed outbound deliveries for Just Play's customers into the following week – further delaying those orders and creating a backlog of future orders that would become past-due.

59. Just Play explained that this was unacceptable. FitzMark could not simply delay orders by a week, since Just Play's customers were clear that "time was of the essence" in shipping all orders. Any delay would subject Just Play to fines from its customers, as well as loss of future business.

60. Moreover, during the period July to October, Just Play ships 66% of its total product for the holiday season. Late shipments during the critical toy-selling season was particularly devastating to Just Play's business relationships with its customers.

61. In response, FitzMark represented that it would bring in workers for an additional shift in order to work through the backlog.

62. In late July 2019, Just Play learned that FitzMark's EDI system – which FitzMark had represented was cutting-edge – was missing huge swaths of Just Play's orders. This meant that when products were delivered to FitzMark's warehouse, FitzMark had no information about the order, including to which of Just Play's customers the order was to be shipped.

63. After learning of the significant deficiencies of FitzMark's EDI system, on July 24, 2019, Just Play once again sent an employee to the FitzMark California warehouse – this time to try to triage what had become nothing short of an emergency.

64. The July visit revealed the full extent of FitzMark's ineptitude. Despite FitzMark's repeated agreement to store Just Play's products exclusively on the warehouse floor, Just Play's products were stacked on the highest racks. Worse, Just Play's products were spread across the warehouse in a seemingly random fashion, mixed with non-Just Play products.

65. To make matters worse, Just Play's products were stored without any pallet bar code placards that could tie the product to the location in FitzMark's inventory control system. This meant that FitzMark had no way of locating Just Play's products in its warehouse. In short, FitzMark was completely incapable of pulling product needed to fulfill Just Play's outbound orders.

66. The Just Play employee also saw that contrary to FitzMark's representation, Sony still had not moved out of the warehouse.

67. At this same time, Just Play learned that a far larger number of orders had not been shipped to Just Play's customers than Just Play had initially realized.

68. Just Play demanded that FitzMark have these orders shipped immediately at FitzMark's expense. FitzMark refused.

69. Worse, FitzMark was unwilling to discuss past orders that it had failed to ship.

70. Additionally, inbound Domestic Shipment Products were being held at the port and in the FitzMark yard as a result of the substantial product backup inside FitzMark's warehouse.

### Just Play Sends a Full Team to California to Mitigate the Damage Done by FitzMark
### (Again)

71. Following the July visit to FitzMark, Just Play did everything in its power to remedy the situation caused by FitzMark, and to minimize future harm to its customers.

72. First, Just Play attempted to divert all future inbound shipments to a non-FitzMark warehouse so that they would not be subject to the substantial backlog created by FitzMark.

73. However, a large number of the incoming shipments were already in transit (or in the FitzMark warehouse), and Just Play could not change the destination. As a result, Just Play sent a team of Just Play employees to the FitzMark warehouse to try to create a coherent logistics plan to deal with the significant problems created by FitzMark. Just Play employees worked across both shifts, seven days a week, to direct FitzMark office staff, label crews, and forklift drivers to manage the incoming shipments. Just Play manually searched the warehouse to locate and label missing products, and pulled products from racks, labeled cartons so that they could be tracked, and even physically loaded trucks to get the product backlog moving out of the FitzMark warehouse.

74. Just Play also arranged its own delivery trucks to pick up special orders for expedited delivery that were critical for certain of its customers' store sets and special feature orders.

75. Just Play expended a tremendous amount of resources – both in terms of employee time and money – to rectify the problems caused solely by FitzMark.

### FitzMark Admits It Failed to Perform the Services

76. In August, FitzMark acknowledged to Just Play that they had failed to perform under the parties' agreement. FitzMark's CEO, Mark Hurley, stated to Just Play that FitzMark's employees had "2 weeks to get their **** together or be terminated… it is that simple, sorry for

the bluntness but that is where we are at now ... Corporate HR is recruiting for Ops Manager/CSRS right now, Neal and I will be reviewing resumes next week."

77. FitzMark also agreed that going forward, Just Play would not be responsible for any costs other than the hourly labor costs of FitzMark's employees.

78. But FitzMark later reneged on that accommodation as well. In September 2019, FitzMark's Owner, Scott Fitzgerald, told Just Play that it would not ship any products to Just Play's customers until the "full payment" – not just labor costs – was made. FitzMark was now holding Just Play's products hostage.

### FitzMark's Failure to Perform Substantially Damaged Just Play

79. Just Play's customers imposed substantial fines from on Just Play for failing to fulfill orders on time. And, Just Play also lost future orders that it would have made but for FitzMark's failures to customers that experienced the shipping delays caused by FitzMark.

80. Additionally, FitzMark's decision to hold Just Play's product hostage put Just Play in an impossible position.

81. If its products were not shipped, Just Play faced even further damage in the form of late penalties and charge-backs from customers. Just Play therefore had no choice but to pay FitzMark the full amount to FitzMark demanded in exchange for the release of Just Play's product to its customers. Just Play agreed to pay FitzMark half of the amount that FitzMark demanded in exchange for half of Just Play's products being shipped out. FitzMark agreed to this deal. However, after Just Play sent the money, FitzMark informed Just Play that *FitzMark* would be the entity that would select which half of Just Play's products could be removed from the warehouse. Just Play explained that it had specific customers awaiting orders of specific products, and that FitzMark's arbitrary selection of products to be released was not workable. FitzMark refused to agree with Just Play's requests, and refused to release the requested orders.

13

FitzMark repeatedly told Just Play that it would not release the products that Just Play needed until Just Play paid the remaining half of the amount demanded.

82. Even after Just Play paid FitzMark the full amount demanded, FitzMark continued to act in bad faith. On September 20, 2019, when a Just Play employee – a 70-year-old man – came to supervise the last remaining shipments from FitzMark's warehouse, he was told that FitzMark would not load the products onto delivery trucks, part of the Services required to be performed by FitzMark. This left Just Play's employee to load all of the product himself.

83. In addition to substantial fines, chargebacks and lost business, Just Play's relationships with its customers were materially compromised.

84. Indeed, Just Play's customers track vendor performance. The performance metric most critical is, not surprisingly, on time delivery. Prior to engaging FitzMark, Just Play had a longstanding record of excellent performance with each of its customers. In just a few months following FitzMark's failure to perform, Just Play's performance status was significantly diminished. In short, entirely as a result of FitzMark's multiple and continued breaches of the parties' agreement, the continued viability of Just Play's entire business operation is now at risk.

## COUNT I - BREACH OF CONTRACT

85. Just Play realleges paragraphs 1 through 84 above.

86. FitzMark and Just Play entered into a contract whereby FitzMark was to perform the following Services:

    a. Maintain Electronic Data Interchange ("EDI") file exchange capabilities;

    b. Provide UCC-128 carton labels;

    c. Generate packing lists and bills of lading;

    d. Provide order management services, including online portal visibility to inventory and order tracking, end-of-day on hand inventory reports, and EDI Advance Ship Notice ("ASN") to be sent at the time of shipping to Just Play's customers; and

    e. Maintain Just Play's goods directly on the warehouse floor, and not in overhead racks that require significantly more retrieval time.

87. In exchange for these services, the parties agreed that Just Play would pay FitzMark according to a rate schedule agreed to by the parties of in early 2019. Just Play paid the agreed rates in full.

88. FitzMark failed to perform the Services as required by the parties' agreement.

89. Just Play has been damaged as a direct, foreseeable and proximate result of FitzMark's breach of the agreement.

90. FitzMark knew, or reasonably should have known, that its failure to perform under the agreement would cause Just Play damages.

91. Just Play took all reasonable efforts to mitigate the damages caused by FitzMark's breaches of the agreement.

WHEREFORE, Just Play demands judgment against FitzMark for compensatory and consequential damages and lost profits, together with pre and post-judgment interest, attorneys' fees and costs, and any other and further relief this court deems just and proper.

### COUNT II – PROMISSORY ESTOPPEL

92. Just Play realleges paragraphs 1 through 84 above.

93. Just Play and FitzMark entered into the Agreement whereby FitzMark was required to perform the following Services:

   a. Maintain Electronic Data Interchange ("EDI") file exchange capabilities;

   b. Provide UCC-128 carton labels;

   c. Generate packing lists and bills of lading;

   d. Provide order management services, including online portal visibility to inventory and order tracking, end-of-day on hand inventory reports, and EDI Advance Ship Notice ("ASN") to be sent at the time of shipping to Just Play's customers; and

   e. Maintain Just Play's goods directly on the warehouse floor, and not in overhead racks that require significantly more retrieval time.

94. Pursuant to the Agreement, Just Play would pay FitzMark according to a rate schedule agreed to by the parties of in early 2019.

95. Just Play reasonably and detrimentally relied on FitzMark's promise to perform the Services.

96. In reliance on FitzMark's promise to perform the Services, Just Play paid FitzMark the agreed upon rates.

97. FitzMark reasonably should have expected that its promise to provide the Services would induce Just Play's reliance.

98. FitzMark failed to perform the Services.

16

99. Injustice can be avoided only by enforcement of FitzMark's promise to Just Play.

WHEREFORE, Just Play demands judgment against FitzMark for damages, together with pre and post-judgment interest, attorneys' fees and costs, and any other and further relief this court deems just and proper.

## COUNT III - UNJUST ENRICHMENT

100. Just Play realleges paragraphs 1 through 84 above.

101. Just Play performed its obligations under the Agreement by paying FitzMark in full for the Services.

102. By performing under the Agreement, Just Play has conferred a benefit on FitzMark.

103. FitzMark knowingly accepted and retained the benefit conferred by Just Play.

104. FitzMark failed to perform under the Agreement, and failed to confer a benefit on Just Play.

105. FitzMark has been unjustly enriched at the expense of Just Play

106. Under the circumstances, it would be inequitable for FitzMark to retain the benefit conferred on it by Just Play without refunding to Just Play the full value thereof.

WHEREFORE, Just Play demands judgment against FitzMark for damages, together with pre and post-judgment interest, attorneys' fees and costs, and any other and further relief this court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Just Play demands a trial by jury on all issues so triable.

Dated this 3rd day of March 2020.

>Respectfully submitted,
>
>**BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
>*Counsel to Plaintiff*
>1450 Brickell Ave., Suite 2300
>Miami, Florida 33131
>Telephone: 305-374-7593
>Facsimile: 305-351-2253
>
>By: */s/ Lori P. Lustrin*
>**Lori Lustrin, Esq.**
>Florida Bar No. 59228
>llustrin@bilzin.com
>**Jerry R. Goldsmith, Esq.**
>Florida Bar No. 119525
>jgoldsmith@bilzin.com
>eservice@bilzin.com

18